AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

In the Matter of the Search of

The premises located at 1143 Howell, St. Louis, Missouri 63147. This location is more fully described as a single story, single family residence, with beige colored siding, trimmed in white, a covered wood porch across the front of the structure, trimmed in white, but the front porch does not have any stair access from ground level to the porch. There are no address numerals on the structure. The rear yard contains a detached garage, a cabover camper, white in color, a secured box trailer, white in color, an open trailer and at least three vehicles (green and brown camouflaged pick- up truck, a second green pick-up truck, and a red van.). (Photos Attached)

Case No.   4:15 MJ 63 DDN

## APPLICATION FOR A SEARCH WARRANT

I, **Ankur Patel**, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

The premises located at 1143 Howell, St. Louis, Missouri 63147. This location is more fully described as a single story, single family residence, with beige colored siding, trimmed in white, a covered wood porch across the front of the structure, trimmed in white, but the front porch does not have any stair access from ground level to the porch. There are no address numerals on the structure. The rear yard contains a detached garage, a cabover camper, white in color, a secured box trailer, white in color, an open trailer and at least three vehicles (green and brown camouflaged pick- up truck, a second green pick-up truck, and a red van.). (Photos Attached)

located in the **EASTERN** District of **MISSOURI**, there is now concealed

### SEE ATTACHMENT: LIST OF ITEMS TO BE SEIZED

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. §5861(d), 26 U.S.C. §5861(e), 18 U.S.C. §922(g)(3), 18 U.S.C. §922 (g)(9), 18 U.S.C. §922(k) | Possession of an Unregistered Firearm/Destructive Device; Possession of a Prohibited Firearm; Possession of a Firearm by a Person who is an Unlawful User or Addicted to a Controlled Substance; Possession of a Firearm and Ammunition by a Person with a Misdemeanor Conviction for Domestic Violence; Possession of a Firearm with Removed, Obliterated, or Altered Serial Number |

The application is based on these facts.

### SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of        days (give exact ending date if more than 30 days:                    ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Ankur Patel
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   March 25, 2015

City and state:   St. Louis, MO

*Judge's signature*

Honorable David D. Noce, U.S. Magistrate Judge
*Printed name and title*

AUSA: Howard J. Marcus

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Ankur Patel, being duly sworn under oath, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Division Office located in St. Louis, Missouri. I have been so employed since November 13, 2005. I am currently assigned to the Domestic Terrorism (DT) Squad. I have previously worked on a variety of criminal and counter-terrorism investigations.

2.     As part of my duties as a Special Agent, I investigate criminal offenses in relation to violations of Title 18, United States Code, Sections 921 et seq. and Title 26, United States Code, Sections 5841 et seq. regarding the illegal possession of, and failure to register, firearms. I have received training in the areas of firearms violations, narcotics violations and gang investigations and during my career have participated in numerous related investigations.

## INTRODUCTION

3.     This affidavit describes an investigation of **David Michael Hagler (Hagler)** and is made in support of obtaining federal search warrants. I am participating in this investigation as part of an investigative team comprised of law enforcement officers, investigators, and analysts with the FBI, and St. Louis Metropolitan Police Department (SLMPD). The facts contained are based upon information of my own personal knowledge, observations and facts related to me by other law enforcement agents and officers and confidential sources involved in this investigation. I have also received information from individuals who are considered experts in their specific fields, a review of the monitored and unmonitored activities of proven reliable cooperating sources, and is also based upon my training and experience. This affidavit is intended to provide probable cause to support the issuance of the search warrants and does not

1

set forth all of the information I have acquired during the course of this investigation.

    4.    Hagler is involved in the:

-possession of an unregistered "short-barreled" shotgun, in violation of Title 26 U.S.C. § 5861(c) and (d);

-illegal possession of a destructive device (pipe bomb), in violation of Title 26 U.S.C. § 5861(c);

-illegal possession and manufacture of an unregistered machinegun (altered AR-15 rifle and a Glock 40 caliber pistol), in violation of Title 26, U.S.C. § 5861(c) and (d);

-unlawful possession of firearms and ammunition by a person who is an unlawful user of or who is addicted to a controlled substance, in violation of Title 18, U.S.C. § 922 (g)(3);

-unlawful possession of firearms and ammunition by a prohibited person who has been convicted of a misdemeanor crime of assault within the definition of a crime of domestic violence, in violation of Title 18, U.S.C. § 922 (g)(9); and

-unlawful possession of a firearm which has the serial number removed, obliterated, or altered, in violation of Title 18, U.S.C. § 922(k).

As defined in Title 26, United States Code, Section 5845(a) the term "firearm" includes: 1) a "destructive device" which is further defined as a "bomb" in subsection (f); 2) a shotgun having a barrel of less than 18 inches in length or a modified shotgun having an overall length of less than 26 inches (a "short-barreled shotgun," See Title 18, U.S.C. § 921(a)(6)); and 3) a machine gun. As defined in Title 26, United States Code, Section 5845(b) the term "machinegun" includes any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

LOCATIONS TO BE SEARCHED

    5.    This affidavit is being made in support of the issuance of search warrants for the following two locations, both being owned by Hagler:

A.    The premises located at 1139 Howell, St. Louis, Missouri 63147. This location is more fully described as a single story, single family residence, with blue colored siding, trimmed in white, a small covered concrete porch on the front of the structure, trimmed in white, which has a white colored storm door. There are no address numerals labelling the residence. This is the primary residence where **Hagler** resides.  (Photo Attached)

B.    The premises located at 1143 Howell, immediately next door to 1139 Howell, St. Louis, Missouri 63147. This location is more fully described as a single story, single family residence, with beige colored siding, trimmed in white, a covered wood porch across the front of the structure, trimmed in white, but the front porch does not have any stair access from ground level to the porch. The front door is white in color.  There are no address numerals labelling the residence. This property is also owned by **Hagler** but utilized for storage. (Photo Attached)

<u>Description of Premises of the Two Properties to be Searched</u>

The two structures are separated by a narrow gangway that runs the length of the structures, from the front of the residences to the rear yard.  The rear yards of the residences are one large rear yard area, as there is no fence separating the rear yards of the two addresses.   There is a six foot tall wood barricade-style privacy fence, surrounding the rear backyards of both residences.  Access to this co-joined rear yard area is accessed via a large gate off the alley way behind the structures.  The joined rear yard contains a detached garage, a cabover camper, white in color, a secured box trailer, white in color, an open trailer and at least three vehicles (green and brown camouflaged pick-up truck, a second green pick-up truck and a red van) which appear to have not been moved in the recent past. Due to the mobility of items currently located within the described premises and the probability that items sought in this warrant are being stored there, search authority is sought for any vehicle and/or item located within the rear yards at the time of the search warrant execution. (Photo Attached)

## COOPERATING SOURCE INFORMATION

6.    The investigation was developed with the assistance of two cooperating sources, who have identified themselves as "friends" of **Hagler**, and have known **Hagler** for a

3

substantial number of years. The information detailed by the two cooperating sources is both historical and recent in time, which has been developed from telephonic and in-person conversations with Hagler, as well as their personal observations. As of mid-February 2015, the two cooperating sources have been under the direction of law enforcement while meeting and/or conversing with Hagler. A number of in-person and telephonic contacts with Hagler were both unrecorded and electronically recorded. When conversations were unrecorded the sources reported the specifics of their contact with Hagler to their investigative law enforcement control agent, which were then documented in detail. When contacts were electronically recorded, the audio and video recordings were reviewed by members of the investigating team and summarized.

7.     Starting in mid-February 2015, Cooperating Source #1 (hereafter referred to as CS#1)[1], advised law enforcement officials that over recent months, CS#1 has observed a substantial deterioration of Hagler's morality, to the point CS#1 believes Hagler poses a substantial threat to law enforcement and others. CS#1 advised he has known Hagler for over thirty years, describing Hagler as an anarchist who holds "extreme" anti-government and anti-law-enforcement views. CS#1 described Hagler as extremely intelligent, at or near genius level, but also as a "Rambo" or a "Mountain Man" type, who lives in the city. Hagler attempts to exist completely off the grid. Hagler has no utilities at his residence(s), heats his home via a wood burning stove, generates electricity by way of solar panels or gasoline generators and uses water from a large container mounted in the back of an open stake bed truck parked in the rear

---

[1] According to the law enforcement investigators, CS#1 has proven to be a reliable cooperating source who has provided accurate information investigators have been able to verify throughout this investigation by independent research and/or observations. CS#1 has not received financial compensation from law enforcement for his/her cooperation. CS#1 has one 1978 misdemeanor conviction for stealing under $50.00.

of his residence(s) which he replenishes from a local filling station.[2] CS#1 attributed Hagler's current high state of agitation to Hagler's continued hatred of his ex-wife, the recent events in Ferguson, Missouri, as well as Hagler's belief he will soon lose his properties to the City of St. Louis for non-payment of taxes.[3]

8.    Hagler was further described by CS#1 as being proficient in mechanics, construction, weapons and fighting/combat tactics. As an example to the latter, CS#1 stated Hagler routinely practices escaping from handcuffs by hiding a handcuffs key on his person and/or swallowing a key, then regurgitating it back up for escape purposes. CS#1 has in the past observed metal plating up against the front interior walls and windows of Hagler's primary residence (1139 Howell). Hagler stated the plates were in place to serve as ballistic protection for a gunfight with law enforcement.[4] CS#1 related that Hagler has dug an underground tunnel, accessible through the basements of the residences, that allows him undetected passage between them.

9.    CS#1 described Hagler as a routine abuser of marijuana who once had an indoor marijuana grow operation in the residence located at 1143 Howell. Hagler bragged to CS#1 how some years ago he incinerated all his plants just prior to the police coming to his residence, after being tipped off of their impending arrival.[5]

---

[2] An inquiry with the local utility providers for the residences found no natural gas, electricity nor water utility service to either 1139 or 1143 Howell. Investigators conducting spot surveillance of the properties have observed the large water container mounted in the bed of a truck in the rear yard as described by CS#1.
[3] A check with the St. Louis City Assessor's Office verified Hagler owes three years back property taxes on the properties listed and described. On 07-11-14 the City of St. Louis sent Hagler a Real Estate Foreclosure Suit Notice. The two listed and described properties are in fact scheduled for seizure by the City of St. Louis in August 2015. Hagler also has an $18,086.00 federal tax lien filed against him by the Internal Revenue Service.
[4] CS#1 did not see these steel plates in place the last time he/she was at the residence, late January 2015.
[5] This information was verified by the review of a 1991 St. Louis County Police Department (SLCPD) investigative report which reflected the police arriving at the Hagler residence and him informing them he had burnt his indoor grow marijuana plants prior to their arrival.

5

10.  CS#1 has in the past, observed a copy of the "Anarchist Cookbook"[6] inside 1143 Howell which was opened up to a section that described the construction of a "foot tripped booby trap." The device is activated when stepped on and discharges a shotgun shell up through the victim's foot. Hagler commented he "would love to see a policeman walk on one of those." Hagler has commented to CS#1 he would like to kill multiple police officers and even discussed scenarios to accomplish the task such as attacking at a police funeral (church or cemetery), or attacking a Back Stoppers or Crime Stoppers event, or attacking a memorial mass for law enforcement officers.

11.  During one of CS#1's visits to Hagler's primary residence, CS#1 observed inside the residence two AR-15 rifles, two AK-47 rifles, two SKS rifles, a number of shotguns, at least ten handguns, a sniper-styled rifle and over 10,000 rounds of various calibers of ammunition. Hagler had previously informed CS#1 he had bought a "trigger kit" for one of his AR-15 rifles and filed it down, converting the rifle to a fully automatic weapon. Hagler also boasted to CS#1 that he had buried a number of rifles in "tubes" but Hagler did not elaborate where the weapons had been buried. During the visit, Hagler bragged about having two "throw down" guns stored in hidden compartments within the walls of the residence. Hagler went to retrieve one of these weapons from a location not in the view of CS#1, but CS#1 did hear Hagler open a kitchen cabinet within the residence to retrieve the weapon.

12.  CS#1 described Hagler's hatred of his ex-wife (they were divorced approximately 30 years ago) as extreme which routinely manifest itself in Hagler's rantings of his desire to "take her out." CS#1 informed investigators that Hagler has offered him money to

---

[6] The Anarchist Cookbook was first published in 1971 and contains sections of instructions for the manufacture of explosives, explosive devices and booby traps, etc.

6

reveal the current address of Hagler's ex-wife. CS#1 initially thought Hagler was not serious about harming his ex-wife, but Hagler confided to CS#1 he had taken someone at gun point to his residence, killed them, then cut up the body and disposed of the body parts.

13. Starting in mid-February 2015, Cooperating Source #2 (hereafter referred to as CS#2)[7], advised law enforcement officials that over recent months, CS#2 also observed an escalated tone of extremism in the views expressed by Hagler toward the government, especially law enforcement personnel, African Americans and Muslims. CS#2's description of Hagler's mental capabilities and talents paralleled the description offered by CS#1. CS#2 further described the mechanic skills of Hagler at the machinist's level, which allows Hagler the talent to manipulate the appearance and firing mechanisms of firearms. Hagler recently commented to CS#2, that if he ever was "diagnosed with a serious illness he is going to kill everyone on his bucket list." CS#2 advised Hagler is always armed with at least one handgun, usually a 9mm or .40 caliber pistol, and always has two to five additional loaded magazines for the weapon.

14. During the first week of February 2015, CS#2 was in the primary residence of Hagler and observed on the only bed: two SKS rifles, two AR-15 rifles, two high powered rifles, two sawed-off pistol grip shotguns and approximately twelve different handguns. CS#2 described one of the sawed-off shotguns as a pump action firearm, being painted black with no visible serial number. The butt stock had been fashioned into a pistol grip and the barrel had been substantially reduced in length, to the point CS#2 believed the weapon to be illegal.

---

[7] According to law enforcement investigators, CS#2 has proven to be a reliable cooperating source who has provided accurate information investigators have been able to verify throughout this investigation by independent research and/or observations. CS#2 has not received financial compensation from law enforcement for his/her cooperation. CS#2 has one misdemeanor conviction for providing uncertified Missouri Concealed Carry certifications. CS#2 has four pending felony charges for filing false Missouri Income Tax.

15.     Also observed by CS#2, was a three foot by four foot by one foot container full of various types and calibers of ammunition. Hagler commented to CS#2, there was "more ammunition in the house." A ballistic vest was also observed by CS#2. Hagler was in the process of moving a large safe into a box trailer parked in the rear, co-joined yards of the property. Hagler commented to CS#2, the weapons and the ammunitions would be placed into the safe inside the box trailer. The reason for moving the weapons and ammunition out of the residence was he (Hagler) prophesized law enforcement was about to execute a search warrant on his property. Hagler believed if a judge signed a search warrant for the residence, law enforcement could not search the box trailer. Hagler then commented to CS#2 that he (Hagler) could sit on the side of the road, shoot an unsuspecting cop and nobody would ever know who did it.

16.     CS#2 advised that in recent and historical encounters with Hagler, Hagler frequently told CS#2 he builds and possesses explosive devices. On one visit to the primary Hagler residence, CS#2 observed a string (tripwire) that ran across the inside of the front door to the structure. Hagler advised CS#2 it was "tied to explosives." Approximately three months ago, CS#2 observed two pipe bombs on a desk in the bedroom at the Hagler primary residence. CS#2 described the devices as short pieces of metal pipe with metal caps on both ends. Hagler informed CS#2 he was going to "mix up" five gallons of tannerite, he (Hagler) could detonate with a blasting cap.[8]     Hagler told CS#2 that he had tannerite in the flower pots on the front

---

[8] Tannerite is the brand name of a binary explosive marketed primarily for making exploding targets for firearms practice. It is a patented combination of ammonium nitrate (an oxidizer) and aluminum powder (a fuel) that is supplied as two separate powders that are mixed and shaken to produce an explosive. The combination is relatively stable when subjected to forces less severe than a high-velocity bullet impact, such as a hammer blow, being dropped, or impact from a low-velocity bullet or shotgun blast. Because it is sold as two separate powders, it can be transported and sold in many places without the legal restrictions that would otherwise apply to explosives.

porch of his home, which he would detonate with gunfire if law enforcement ever came to his home. During another recent encounter, Hagler made a request of CS#2, to "rob a bank" with him (Hagler). CS#2 advised that Hagler likes to modify weapons and that Hagler recently modified a Glock handgun which shoots three to five round burst on every trigger pull. Hagler showed the CS#2 that modified Glock and demonstrated its multiple burst capabilities two weeks ago. Hagler has also modified the serial numbers on his guns. Hagler recently found a Glock pistol on the side of a road. Hagler told CS#2 that he was going to change the serial number on the gun. He has a tap set to print a new serial number on a clean slide.

## APPLICABLE CRIMINAL HISTORY OF HAGLER

17. A review of the criminal history reporting on Hagler which demonstrates and enumerates his affiliation with marijuana, his possession of weapons and demonstrated propensity to utilize them, and prior encounters with government officials at his residence(s), by a number of law enforcement agencies revealed the following pertinent information:

A. A 01-10-1980 SLCPD report detailing the sale of 103.9 grams of marijuana for $180.00 of official funds by Hagler to an undercover detective. Hagler was not prosecuted for this law violation.

B. A 04-15-86 Cool Valley Police Department report detailing the arrest of Hagler for felony Stealing and two counts of Carrying a Concealed Weapon. (ordinance violation). Hagler received a suspended sentence and was placed on one year of probation.

C. A 09-17-1986 SLMPD report detailing the arrest of Hagler for flourishing a weapon. The incident occurred in front of 1143 Howell, where-in Hagler and the victim became involved in an argument in the rear yard of the property. During the argument Hagler retreated into the residence, obtained a 20 gauge shotgun, displayed it at the victim, stating, "this is for you." The victim in this matter signed a No Prosecution Form.

D. A 05-05-1988 SLMPD report which details the arrest of Hagler for harassment, where-in Hagler telephonically contacted the manager of the City of St. Louis Animal

Control Unit, identified himself, and stated. "You're going to be the next highway shooting. You can bet I'll get you." The contact being brought on by the performance of official duties by the manager at 1143 Howell referencing municipal canine law violations. Hagler received a suspended imposition of sentence to the misdemeanor charge of Harassment and received one year of probation.

E.    A 09-11-88 SLMPD report detailing the arrest of Hagler for flourishing a weapon at multiple victims. The incident occurred in the rear alley and rear yard of 1143 Howell, where-in Hagler became involved in an argument with three of his neighbors. During the argument, the neighbors alleged Hagler retrieved a handgun and pointed it in a threatening manner, which caused them to retreat. No weapon was recovered by responding officers.

F.    A 03-30-89 SLMPD report detailing the arrest of Hagler for flourishing a weapon at a victim who was walking in the rear alley behind the Howell residence(s) of Hagler. When confronted by responding officers, Hagler denied pointing a shotgun at the victim but did admit owning a shotgun which was secured within his residence. Hagler refused entry to his residence to the officers.

G.    A 02-27-91 SLCPD report detailing the execution of a Consent to Search at 1143 Howell by narcotics detectives. Hagler had allowed the detectives to search his residence or storage locations as part of a cultivating marijuana investigation. Hagler informed the detectives he had received a warning of their pending arrival and burnt all his cultivated marijuana plants in his wood burning stove. Hagler informed the officers he then dismantled his indoor grow equipment.

H.    A 04-09-95 SLMPD report detailing the arrest of Hagler for Assault Third Degree which occurred at 1143 Howell. The female victim of the assault indicated Hagler and her were in a boyfriend/girlfriend relationship. The victim reported she was at 1143 Howell when they became embroiled in a heated verbal argument. During the argument, Hagler slapped her and kicked her numerous times. On 11-16-95, per Cause #22-959-03265, in the 22nd Judicial Court of Missouri, Hagler pled guilty to the misdemeanor charge of Assault Third Degree with Injury, receiving a thirty day Suspended Execution of Sentence and one year of probation.

I.    A 09-20-13 SLMPD report detailing the arrest of Hagler for flourishing a handgun at a victim in 2012 who was dumping trash in a dumpster in the rear alley behind 1143 Howell. The victim accused Hagler of pointing a semi-automatic handgun at him during the confrontation. Hagler admitted to having a handgun in his hand, but denied pointing the weapon at the victim. The victim refused to assist in the prosecution of Hagler.

10

<u>INVESTIGATION UPDATES</u>

18.     On Monday 02-23-15, Hagler telephonically contacted CS#2. CS#2 was able to activate an audio recording device to capture the conversation. During the course of the extensive conversation on a number of topics, Hagler stated:

-that he had sold a number of guns and ammunition to friends of his at great prices;

-that he is not happy with CS#1 and he better not come around his house. CS#2 stated CS#1 was afraid to come around Hagler's house as he did not want to step on any surprises. Hagler indicated he had surprises all over his yard. (From prior conversations with Hagler, CS#2 understands the reference to "surprises" to mean exploding booby traps.);

-that if they (law enforcement) come for his house he will have a surprise for them. In front of his house will be a flower pot with a gallon of tannerite (an explosive) on the sidewalk and a bag of marbles mixed in. CS#2 questioned Hagler if he thought that would take a lot of cops out. Hagler answered, "it should slow them down by taking a lot of their legs out.";

-Hagler indicated he could add a few more pages to the "Anarchist Cookbook." CS#2 asked Hagler like what, to which Hagler answered, "like the cyclone fence and cinder blocks and a fish finder on the boat." Hagler continued, "most of the Missouri river is twenty feet deep but there are spots that are one hundred and twenty feet, the location believed by Hagler to be an underwater sink hole." Hagler went back to the topic of the Anarchist Cookbook which Hagler advised contained all types of instructions on explosives and where to place them to cause the most damage.

19.     On March 3, 2015, Hagler spoke to CS#2 telephonically. CS#2 was not able to activate an audio recording device to capture the conversation but reported the contact to the FBI. During the course of the conversation on a number of topics, Hagler stated:

-he would come by the residence of CS#2 in the next few days and modify a Glock pistol so the firearm would discharge multiple shots (three to five round bursts) with a single activation of the firearm's trigger mechanism.

20.     On March 5, 2015, Hagler met with CS#2 in person. CS#2 did activate an audio recording device to capture the conversation but the recording device failed to operate. During the

course of the encounter, Hagler:

-displayed to CS#2 a Glock .40 caliber handgun which Hagler bragged he had modified to shoot more than one round with the activation of a single pull of the trigger. Hagler demonstrated the weapons capability by pulling the trigger of the weapon which caused it to fire two rounds. Hagler informed CS#2 the two round discharge was called a, "double tap." Hagler then allowed CS#2 to operate the modified Glock handgun. When CS#2 pulled the trigger of the weapon, the firearm again fired a two shot burst with a single activation of the trigger mechanism.

-during the continuing conversation, Hagler informed CS#2 he had filed off and removed the serial numbers from a handgun he (Hagler) had found on the side of the road. Hagler also stated he had sawed off the barrels of two of his shotguns and also removed the serial numbers from the weapons and then painted one of them black. Hagler also informed CS#2 he would show CS#2 how to modify weapons to make them fully automatic.

21.     On March 6, 2015, Hagler met with CS#2 in person. CS#2 did activate an audio and video recording device to capture the conversation that occurred between the pair. During the course of the encounter:

-Hagler indicated he is not happy with CS#1. Hagler mentioned to CS#2 he could easily hurt CS#1 if he really wanted to.

-Hagler told a story of his recent travel downtown and on his return trip mistakenly got onto the new bridge going to Illinois but stopped on the bridge because he had his gun sitting on the seat loaded. Hagler unloaded the firearm, broke it down into pieces and secured it within areas of his truck. Once he got back across the bridge into Missouri he re-assembled the weapon.

-Hagler indicated he buried a Glock pistol he had found on the interstate the last time he went out on the river on a hillside.

-Hagler informed CS#2 if you wanted to really stir things up in Ferguson all you had to do is shoot a couple of the cops while the protestors were out demonstrating.

-Hagler admitted he used to grow high grade marijuana at his house then commented he still does. Hagler stated he grows it in an area hidden in the wall behind a large mirror in the basement bathroom that allows access to a hidden area of the basement but does not grow like he did because he does not have electricity.

-CS#2 commented he (Hagler) could get time for having his Glock pistol shoot more than one round. Hagler indicated he made his Glock pistol to shoot individual rounds again.

-Hagler described to CS#2 how he filed down a nub within the mechanism of his AR-15 to make it shoot full auto.

12

22.    On March 17, 2015, Hagler met with CS#2 in person at the residences of Hagler. CS#2 did activate an audio and video recording device to capture the conversation and imagery that occurred between the pair. During the course of the encounter:

-CS#2 first met Hagler in the combined rear yards of the two specified properties. Within the curtilage of the rear yards (observed on the video recording) was:

      -a white colored cab over camper, mounted on stilts, that was positioned against the rear alley side of the rear yard;

      -a white painted dual wheeled box trailer with a side and rear doors, the doors being secured via a padlock;

      -a green and brown camouflage pattern painted pickup truck with an open bed that had a black colored ladder rack mounted on it;

      -a faded green/beige colored pickup truck bearing Missouri license 4PE930 which is registered to Hagler at 1143 Howell;

      -a red/maroon Chevy Astro van bearing Missouri license 0DR360 which is registered to Hagler at 1143 Howell.

-CS#2 and Hagler then entered 1139 Howell. (It should be noted the video of the encounter inside the residence is of poor quality due to minimal illumination.) While inside the residence, CS#2 observed:

      -numerous boxes of varying calibers of ammunition, scattered throughout the residence. CS#2 commented to Hagler that he had not as yet put the ammunition away.

      -a bullet proof vest partially under a pillow on the bed where Hagler sleeps within the residence. Also noted was an empty gun rack for a single long gun which was mounted near the head of the bed. When CS#2 commented on the body armor and the gun rack near the head of the bed, Hagler stated he was ready.

      -the gun safe of Hagler to be open. Observed by CS#2 (partially verified by the video recording) were a number of long guns to include rifles and shotguns as well as handguns. Specifically, CS#2 noted the previously described sawed off shotgun with a pistol grip within the safe.

23.    On March 20, 2015, Alcohol, Tobacco, and Firearms (ATF) Special Agent Michael Froncheck verified that Hagler has no current, or past, firearm registrations with the National Firearms Registration and Transfer Record.

IMPROVISED EXPLOSIVE DEVICES

24.     I have consulted with a certified FBI bomb technician who has completed the FBI Hazardous Devices School. The information contained herein was obtained by me from written and oral reports of qualified bomb technicians and others. An Improvised Explosive Device (IED) as in the case of a pipe bomb is constructed with three components:

a.     The Container. The container such as a metal pipe or PVC or tube is used to contain the explosive components. The container can also contain fragmentation or shrapnel intended to cause additional injury. Fragmentation and shrapnel can be made from nails, screws, nuts, bolts, BB's, lead shot and similar material.

b.     The Explosive. IED's are typically constructed from low explosives such as black powder, Pyrodex, smokeless powder, and flash powder. The main explosive charge can also be made from various chemicals to include fuels and oxidizers such as ammonium nitrate, fuel oil, nitro methane, phosphorus, peroxides, acids, sulfur, charcoal, perchlorate mixtures, potassium nitrate, acetone and powdered metals such as aluminum and magnesium

c.     The Fuse system. The fuse system is what initiates the device. The fuse system can initiate the bomb or IED based on time, something the intended victim does, or on the command of the bomber. The initiator can be a commercial blasting cap, electric match, squib time fuse, canon or hobby fuse or an improvised initiator.

25.     I am informed that explosive devices (pipe bombs), such as the ones observed by CS#2, have the ability to cause serious physical injury and death. The devices also have the ability to damage buildings and structures. Once the container is penetrated by the force of the

14

explosion, it will fragment outward, each piece of the steal shell serving as a deadly projectile. The bomb causes damage in several different ways, depending on the point at which the explosion impacts. These different points include the blast wave, shock waves, fragmentation, heat and the blast wind. Blast waves are over-pressurized highly compressed air particles that may travel faster than the speed of sound. The wave will dissipate over time and distance and will exist for a matter of milliseconds. The initial blast wave inflicts the most damage. When the blast wave reaches a structure or a person it will damage the structure or body on impact. Shockwaves will continue to pass through the body to include the organs and tissue. Shockwaves carry energy through the medium they pass through. Fragmentation (described above) may also include secondary fragmentation wherein the initial fragments strike buildings, concrete, masonry, glass and even people causing further fragmentation. Fire and heat are caused from the initial fireball and high temperatures, which will result in burns on a human body or even cause secondary fires or explosions, depending on whether other fuel sources are located near the blast. Blast wind is a vacuum created by the rapid outward movement of the blast. This vacuum will almost immediately refill itself with the surrounding atmosphere creating a very strong pull on any nearby person or structural surface. As this void is refilled, it creates a high intensity wind that causes fragmented objects, glass and debris to be drawn back in toward the source of the explosion.

## INFORMATION BASED ON TRAINING AND EXPERIENCE

26.     As part of my experience and training as a Special Agent with the FBI, and that of other special agents and police officers on the investigating team, we have accumulated information and training in the areas of narcotics based economic crime and firearms. I have

had extensive experience, as have other members of the investigating team, in interviewing defendants, witnesses, informants and others who have experience in the gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics and firearms trafficking. Based upon my and the investigating teams experience and our participation in other pending and completed controlled substances and firearms investigations, I know the following:

      a.    It is common for abusers of narcotics to secrete contraband and illegally obtained and possessed firearms. Drug abusers frequently keep in their residence or storage locations under their direct control: narcotics, paraphernalia for ingesting, packaging, weighing, and storing drugs. This paraphernalia, includes, but is not limited to ingestion devices and scales.

      b.    Those having the ability to modify firearms into prohibited weapons, frequently keep in their residence or storage locations under their direct control: firearms, ammunition, extra magazines, firearm cleaning supplies, owner's manuals, how to manuals, firearms literature, storage containers and cases and holsters as well as ownership records and indicia of ownership, and records and documents related to the acquisition, sale or transfer of firearms.

      c.    Evidence of occupancy and residence or ownership of storage locations property and vehicles, including, but not limited to, bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in firearms prosecutions.

27.    Based upon the investigation by your affiant and other law enforcement officers, I believe that documents and other indicia, as mentioned above, evidencing participation in drug abuse, as well as illegal firearms possession, will be found at the premises indicated above.

28.     I, therefore, respectfully requests that the Court issue search warrants for the premises previously identified, and thereupon to search for and seize items described in the attached list to the application for a search warrant submitted in connection with this affidavit, such items constituting evidence of the enumerated violations.

SPECIAL CONSIDERATIONS

29.     If permission to search and seize is granted by the Court, and if the opportunity to safely execute presents itself, it is anticipated the authority to search will be executed on Thursday, March 26, 2015.  Surveillance of the properties will be initiated in the early morning hours of that date, prior to 6:00AM, and continue until Hagler leaves the location to be searched. His departure time is unknown for the date, but may also be later than 10:00PM.  Therefore, based on the investigating team's desire to search while Hagler is away from the two properties so as to minimize his accessibility to firearms and explosive devices located onsite, pursuant to Federal Rules of Criminal Procedure 41(e)(ii), search authority for night time execution is hereby sought.  This authority, if granted by the Court, will allow the search warrants to be executed in a manner that affords law enforcement and the general public in the immediate area, the highest level of safety given the described and outlined circumstances.

30.     Due to the slow, methodical nature of the mechanical and human search techniques necessary to ensure the safety of law enforcement and the immediate general public, which are based on the allegations contained within, it is requested the Court grant Special Agents of the FBI permission to maintain complete control of the described property, for the extended period of time necessary to allow for the safe and thorough search of the premises. Due to the potential explosive devices and "booby traps" that may be present on the properties to

17

be searched, it is expected the process will take at least several days. Therefore, it is requested that agents be permitted to maintain control of the properties continuously from the time of execution of the search, through its completion and rendering of the properties safe.

REQUEST FOR SEALING

31.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

18

## ATTACHMENT: LIST OF ITEMS TO BE SEIZED

The items to be seized are: evidence, contraband, fruits of a crime, items illegally possessed, or property used or designed or intended for use in committing violations of: Title 26, United States Code, Section 5861(d) (Possession of an Unregistered Firearm/Destructive Device); Title 26, United States Code, Section 5861(c) (Possession of a Prohibited Firearm); Title 18, United States Code, Section 922(g)(3) (Possession of a Firearm by a Person who is an Unlawful User or Addicted to a Controlled Substance); Title 18, United States Code, Section 922(g)(9) (Possession of a Firearm and Ammunition by a Person with a Misdemeanor Conviction for Domestic Violence); and Title 18, United States Code, Section 922(k) (Possession of a Firearm with Removed, Obliterated or Altered Serial Number) to include:

1. Firearms, ammunition, firearms accessories, including but not limited to: magazines, firearm cleaning supplies, owner's manuals, how to manuals, firearms literature, receipts, storage containers and cases and holsters, ownership records and indicia of ownership, records and documents related to the sale or transfers of firearms.

2. Cellular telephones, telephone bills, invoices, records, receipts for cellular telephone purchase/service.

3. Photographs of the individuals identified in the affidavit to this warrant including those evidently in possession of firearms.

4. Titles, deeds and documents reflecting ownership of vehicles and property located on the premises of the residence.

5. Evidence of occupancy and residence or storage locations under direct control including, but not limited to, utility and telephone bills, canceled envelopes, rental or lease agreements, and keys to the residence or storage locations.

6. Evidence concerning explosives, bombs, incendiary devices, or other firearms and destructive devices.

7. Receipts, documents, literature, or materials regarding explosives.

8. Evidence concerning associates, conspirators, and other persons who may be involved in, or relate to, the commission of the aforementioned offenses.

9. Narcotics and narcotics paraphernalia, including but is not limited to, ingestion devices, scales, plastic bags, and cutting agents.

