GOVERNMENT
EXHIBIT
5

CARDELS 800-783-0399

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| United States of America ) | |
| v. ) | |
| David Michael Hagler ) | Case No.  4:15 MJ 61 DDN |
| ) | |
| ) | |
| ) | |
| ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____12-1-2014 to 03-23-15_____ in the county of _____St. Louis_____ in the

_____Eastern_____ District of _____Missouri_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 26, U.S.C. § 5861(c) and (d) | Possession of an unregistered "short-barreled" shotgun and unregistered machinegun |
| Title 18, U.S.C. § 922(g)(3) | Possession of firearms and ammunition by an unlawful user of controlled substances |
| Title 18, U.S.C. § 922(g)(9) | Possession of firearms and ammunition by person convicted of misdemeanor crime of assault within definition of a crime of domestic violence |
| Title 18, U.S.C. § 922(k) | Possession of firearm with serial number removed, oblitered, or altered |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Ankur Patel, FBI

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____03/24/2015_____

_____
*Judge's signature*

City and state: _____St. Louis, Missouri_____

Honorable David D. Noce, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Ankur Patel, being duly sworn under oath, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Division Office located in St. Louis, Missouri.  I have been so employed since November 13, 2005.  I am currently assigned to the Domestic Terrorism (DT) Squad.  I have previously worked on a variety of criminal and counter-terrorism investigations.

2.      As part of my duties as a Special Agent, I investigate criminal offenses in relation to violations of Title 18, United States Code, Sections 921 et seq. and Title 26, United States Code, Sections 5841 et seq. regarding the illegal possession of, and failure to register, firearms.  I have received training in the areas of firearms violations, narcotics violations and gang investigations and during my career have participated in numerous related investigations.

## INTRODUCTION

3.      This affidavit describes an investigation of **David Michael Hagler (Hagler)** and is made in support of obtaining a federal arrest warrant.  I am participating in this investigation as part of an investigative team comprised of law enforcement officers, investigators, and analysts with the FBI, and St. Louis Metropolitan Police Department (SLMPD).  The facts contained are based upon information of my own personal knowledge, observations and facts related to me by other law enforcement agents and officers and confidential sources involved in this investigation.  I have also received information from individuals who are considered experts in their specific fields, a review of the monitored and unmonitored activities of proven reliable cooperating sources, and is also based upon my training and experience.  This affidavit is intended to provide probable cause to support the issuance of the arrest warrant and does not set

1

forth all of the information I have acquired during the course of this investigation.

4.   Hagler is involved in the:

-possession of an unregistered "short-barreled" shotgun, in violation of Title 26, U.S.C. § 5861(c) and (d);

-illegal possession and manufacture of an unregistered machinegun (altered AR-15 rifle and a Glock 40 caliber pistol), in violation of Title 26, U.S.C. § 5861(c) and (d);

-unlawful possession of firearms and ammunition by a person who is an unlawful user of or who is addicted to a controlled substance, in violation of Title 18, U.S.C. § 922 (g)(3);

-unlawful possession of firearms and ammunition by a prohibited person who has been convicted of a misdemeanor crime of assault within the definition of a crime of domestic violence, in violation of Title 18, U.S.C. § 922 (g)(9); and

-unlawful possession of a firearm which has the serial number removed, obliterated, or altered, in violation of Title 18, U.S.C. § 922(k).

As defined in Title 26, United States Code, Section 5845(a) the term "firearm" includes: 1) a "destructive device" which is further defined as a "bomb" in subsection (f); 2) a shotgun having a barrel of less than 18 inches in length or a modified shotgun having an overall length of less than 26 inches (a "short-barreled shotgun," See Title 18, U.S.C. § 921(a)(6)); and 3) a machine gun. As defined in Title 26, United States Code, Section 5845(b) the term "machinegun" includes any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

COOPERATING SOURCE INFORMATION

5.   The investigation was developed with the assistance of two cooperating sources, who have identified themselves as "friends" of **Hagler**, and have known **Hagler** for a substantial number of years. The information detailed by the two cooperating sources is both

2

historical and recent in time, which has been developed from telephonic and in-person conversations with **Hagler,** as well as their personal observations. As of mid-February 2015, the two cooperating sources have been under the direction of law enforcement while meeting and/or conversing with **Hagler.** A number of in-person and telephonic contacts with **Hagler** were both unrecorded and electronically recorded. When conversations were unrecorded the sources reported the specifics of their contact with **Hagler** to their investigative law enforcement control agent, which were then documented in detail. When contacts were electronically recorded, the audio and video recordings were reviewed by members of the investigating team and summarized.

6.   **Hagler** resides at 1139 Howell, St. Louis, Missouri 63147 but also owns the residence next door, 1143 Howell, St. Louis, Missouri 63147. The first address is the primary residence of **Hagler** while the latter address is utilized by **Hagler** for storage. The rear yard of the two addresses is not separated by fence, however, both properties' rear yards are surrounded by a wooded privacy fence, combining the rear curtilage into one area.

7.   Starting in mid-February 2015, Cooperating Source #1 (hereafter referred to as CS#1)[1], advised law enforcement officials that over recent months, CS#1 has observed a substantial deterioration of **Hagler's** morality, to the point CS#1 believes **Hagler** poses a substantial threat to law enforcement and others. CS#1 advised he has known **Hagler** for over thirty years, describing **Hagler** as an anarchist who holds "extreme" anti-government and anti-law-enforcement views. CS#1 described **Hagler** as extremely intelligent, at or near genius

---

[1] According to the law enforcement investigators, CS#1 has proven to be a reliable cooperating source who has provided accurate information investigators have been able to verify throughout this investigation by independent research and/or observations. CS#1 has not received financial compensation from law enforcement for his/her cooperation. CS#1 has one 1978 misdemeanor conviction for stealing under $50.00.

level, but also as a "Rambo" or a "Mountain Man" type, who lives in the city. **Hagler** attempts to exist completely off the grid. **Hagler** has no utilities at his residence(s), heats his home via a wood burning stove, generates electricity by way of solar panels or gasoline generators and uses water from a large container mounted in the back of an open stake bed truck parked in the rear of his residence(s) which he replenishes from a local filling station.[2] CS#1 attributed **Hagler's** current high state of agitation to **Hagler's** continued hatred of his ex-wife, the recent events in Ferguson, Missouri, as well as **Hagler's** belief he will soon lose his properties to the City of St. Louis for non-payment of taxes.[3]

8.    **Hagler** was further described by CS#1 as being proficient in mechanics, construction, weapons and fighting/combat tactics. As an example to the latter, CS#1 stated **Hagler** routinely practices escaping from handcuffs by hiding a handcuffs key on his person and/or swallowing a key, then regurgitating it back up for escape purposes. CS#1 has in the past observed metal plating up against the front interior walls and windows of **Hagler's** primary residence (1139 Howell). **Hagler** stated the plates were in place to serve as ballistic protection for a gunfight with law enforcement.[4] CS#1 related that **Hagler** has dug an underground tunnel, accessible through the basements of the residences, that allows him undetected passage between them.

9.    CS#1 described **Hagler** as a routine abuser of marijuana who once had an indoor

---

[2] An inquiry with the local utility providers for the residences found no natural gas, electricity nor water utility service to either 1139 or 1143 Howell. Investigators conducting spot surveillance of the properties have observed the large water container mounted in the bed of a truck in the rear yard as described by CS#1.
[3] A check with the St. Louis City Assessor's Office verified **Hagler** owes three years back property taxes on the properties listed and described. On 07-11-14 the City of St. Louis sent **Hagler** a Real Estate Foreclosure Suit Notice. The two listed and described properties are in fact scheduled for seizure by the City of St. Louis in August 2015. Hagler also has an $18,086.00 federal tax lien filed against him by the Internal Revenue Service.
[4] CS#1 did not see these steel plates in place the last time he/she was at the residence, late January 2015.

4

marijuana grow operation in the residence located at 1143 Howell.  **Hagler** bragged to CS#1 how some years ago he incinerated all his plants just prior to the police coming to his residence, after being tipped off of their impending arrival.[5]

10.     CS#1 has in the past, observed a copy of the "Anarchist Cookbook"[6] inside 1143 Howell which was opened up to a section that described the construction of a "foot tripped booby trap." The device is activated when stepped on and discharges a shotgun shell up through the victim's foot.  **Hagler** commented he "would love to see a policeman walk on one of those." **Hagler** has commented to CS#1 he would like to kill multiple police officers and even discussed scenarios to accomplish the task such as attacking at a police funeral (church or cemetery), or attacking a Back Stoppers or Crime Stoppers event, or attacking a memorial mass for law enforcement officers.

11.    . During one of CS#1's visits to **Hagler's** primary residence, CS#1 observed inside the residence two AR-15 rifles, two AK-47 rifles, two SKS rifles, a number of shotguns, at least ten handguns, a sniper-styled rifle and over 10,000 rounds of various calibers of ammunition. **Hagler** had previously informed CS#1 he had bought a "trigger kit" for one of his AR-15 rifles and filed it down, converting the rifle to a fully automatic weapon.  **Hagler** also boasted to CS#1 that he had buried a number of rifles in "tubes" but **Hagler** did not elaborate where the weapons had been buried.  During the visit, **Hagler** bragged about having two "throw down" guns stored in hidden compartments within the walls of the residence.  **Hagler** went to retrieve one of these weapons from a location not in the view of CS#1, but CS#1 did hear **Hagler** open a kitchen

---

[5] This information was verified by the review of a 1991 St. Louis County Police Department (SLCPD) investigative report which reflected the police arriving at the Hagler residence and him informing them he had burnt his indoor grow marijuana plants prior to their arrival.

[6] The Anarchist Cookbook was first published in 1971 and contains sections of instructions for the manufacture of explosives, explosive devices and booby traps, etc.

5

cabinet within the residence to retrieve the weapon.

12.     CS#1 described **Hagler's** hatred of his ex-wife (they were divorced approximately 30 years ago) as extreme which routinely manifest itself in **Hagler's** rantings of his desire to "take her out." CS#1 informed investigators that **Hagler** has offered him money to reveal the current address of **Hagler's** ex-wife. CS#1 initially thought **Hagler** was not serious about harming his ex-wife, but **Hagler** confided to CS#1 he had taken someone at gun point to his residence, killed them, then cut up the body and disposed of the body parts.

13.     Starting in mid-February 2015, Cooperating Source #2 (hereafter referred to as CS#2)[7], advised law enforcement officials that over recent months, CS#2 also observed an escalated tone of extremism in the views expressed by **Hagler** toward the government, especially law enforcement personnel, African Americans and Muslims. CS#2's description of **Hagler's** mental capabilities and talents paralleled the description offered by CS#1. CS#2 further described the mechanic skills of **Hagler** at the machinist's level, which allows **Hagler** the talent to manipulate the appearance and firing mechanisms of firearms. **Hagler** recently commented to CS#2, that if he ever was "diagnosed with a serious illness he is going to kill everyone on his bucket list." CS#2 advised **Hagler** is always armed with at least one handgun, usually a 9mm or .40 caliber pistol, and always has two to five additional loaded magazines for the weapon.

14.     During the first week of February 2015, CS#2 was in the primary residence of

---

[7] According to law enforcement investigators, CS#2 has proven to be a reliable cooperating source who has provided accurate information investigators have been able to verify throughout this investigation by independent research and/or observations. CS#2 has not received financial compensation from law enforcement for his/her cooperation. CS#2 has one misdemeanor conviction for providing uncertified Missouri Concealed Carry certifications. CS#2 has four pending felony charges for filing false Missouri Income Tax.

Hagler and observed on the only bed: two SKS rifles, two AR-15 rifles, two high powered rifles, two sawed-off pistol grip shotguns and approximately twelve different handguns. CS#2 described one of the sawed-off shotguns as a pump action firearm, being painted black with no visible serial number. The butt stock had been fashioned into a pistol grip and the barrel had been substantially reduced in length, to the point CS#2 believed the weapon to be illegal.

15.     Also observed by CS#2, was a three foot by four foot by one foot container full of various types and calibers of ammunition. Hagler commented to CS#2, there was "more ammunition in the house." A ballistic vest was also observed by CS#2. Hagler was in the process of moving a large safe into a box trailer parked in the rear, co-joined yards of the property. Hagler commented to CS#2, the weapons and the ammunitions would be placed into the safe inside the box trailer. The reason for moving the weapons and ammunition out of the residence was he (Hagler) prophesized law enforcement was about to execute a search warrant on his property. Hagler believed if a judge signed a search warrant for the residence, law enforcement could not search the box trailer. Hagler then commented to CS#2 that he (Hagler) could sit on the side of the road, shoot an unsuspecting cop and nobody would ever know who did it.

16.     CS#2 advised that in recent and historical encounters with Hagler, Hagler frequently told CS#2 he builds and possesses explosive devices. On one visit to the primary Hagler residence, CS#2 observed a string (tripwire) that ran across the inside of the front door to the structure. Hagler advised CS#2 it was "tied to explosives." Approximately three months ago, CS#2 observed two pipe bombs on a desk in the bedroom at the Hagler primary residence. CS#2 described the devices as short pieces of metal pipe with metal caps on both ends. Hagler

informed CS#2 he was going to "mix up" five gallons of tannerite, he (Hagler) could detonate with a blasting cap.[8]   Hagler told CS#2 that he had tannerite in the flower pots on the front porch of his home, which he would detonate with gunfire if law enforcement ever came to his home.  During another recent encounter, Hagler made a request of CS#2, to "rob a bank" with him (Hagler).  CS#2 advised that Hagler likes to modify weapons and that Hagler recently modified a Glock handgun which shoots three to five round burst on every trigger pull.  Hagler showed the CS#2 that modified Glock and demonstrated its multiple burst capabilities two weeks ago.  Hagler has also modified the serial numbers on his guns.  Hagler recently found a Glock pistol on the side of a road.  Hagler told CS#2 that he was going to change the serial number on the gun. He has a tap set to print a new serial number on a clean slide.

APPLICABLE CRIMINAL HISTORY OF HAGLER

17.    A review of the criminal history reporting on Hagler which demonstrates and enumerates his affiliation with marijuana, his possession of weapons and demonstrated propensity to utilize them, and prior encounters with government officials at his residence(s), by a number of law enforcement agencies revealed the following pertinent information:

A.    A 01-10-1980 SLCPD report detailing the sale of 103.9 grams of marijuana for $180.00 of official funds by Hagler to an undercover detective. Hagler was not prosecuted for this law violation.

B.    A 04-15-86 Cool Valley Police Department report detailing the arrest of Hagler for felony Stealing and two counts of Carrying a Concealed Weapon. (ordinance violation).  Hagler received a suspended sentence and was placed on one year of probation.

---

[8] Tannerite is the brand name of a binary explosive marketed primarily for making exploding targets for firearms practice. It is a patented combination of ammonium nitrate (an oxidizer) and aluminum powder (a fuel) that is supplied as two separate powders that are mixed and shaken to produce an explosive. The combination is relatively stable when subjected to forces less severe than a high-velocity bullet impact, such as a hammer blow, being dropped, or impact from a low-velocity bullet or shotgun blast. Because it is sold as two separate powders, it can be transported and sold in many places without the legal restrictions that would otherwise apply to explosives.

C.     A 09-17-1986 SLMPD report detailing the arrest of **Hagler** for flourishing a weapon. The incident occurred in front of 1143 Howell, where-in **Hagler** and the victim became involved in an argument in the rear yard of the property. During the argument **Hagler** retreated into the residence, obtained a 20 gauge shotgun, displayed it at the victim, stating, "this is for you." The victim in this matter signed a No Prosecution Form.

D.     A 05-05-1988 SLMPD report which details the arrest of **Hagler** for harassment, where-in **Hagler** telephonically contacted the manager of the City of St. Louis Animal Control Unit, identified himself, and stated. "You're going to be the next highway shooting. You can bet I'll get you." The contact being brought on by the performance of official duties by the manager at 1143 Howell referencing municipal canine law violations. **Hagler** received a suspended imposition of sentence to the misdemeanor charge of Harassment and received one year of probation.

E.     A 09-11-88 SLMPD report detailing the arrest of **Hagler** for flourishing a weapon at multiple victims. The incident occurred in the rear alley and rear yard of 1143 Howell, where-in **Hagler** became involved in an argument with three of his neighbors. During the argument, the neighbors alleged **Hagler** retrieved a handgun and pointed it in a threatening manner, which caused them to retreat. No weapon was recovered by responding officers.

F.     A 03-30-89 SLMPD report detailing the arrest of **Hagler** for flourishing a weapon at a victim who was walking in the rear alley behind the Howell residence(s) of **Hagler**. When confronted by responding officers, **Hagler** denied pointing a shotgun at the victim but did admit owning a shotgun which was secured within his residence. **Hagler** refused entry to his residence to the officers.

G.     A 02-27-91 SLCPD report detailing the execution of a Consent to Search at 1143 Howell by narcotics detectives. **Hagler** had allowed the detectives to search his residence or storage locations as part of a cultivating marijuana investigation. **Hagler** informed the detectives he had received a warning of their pending arrival and burnt all his cultivated marijuana plants in his wood burning stove. **Hagler** informed the officers he then dismantled his indoor grow equipment.

H.     A 04-09-95 SLMPD report detailing the arrest of **Hagler** for Assault Third Degree which occurred at 1143 Howell. The female victim of the assault indicated **Hagler** and her were in a boyfriend/girlfriend relationship. The victim reported she was at 1143 Howell when they became embroiled in a heated verbal argument. During the argument, **Hagler** slapped her and kicked her numerous times. On 11-16-95, per Cause #22-959-03265, in the 22nd Judicial Court of Missouri, **Hagler** pled guilty to the misdemeanor charge of Assault Third Degree with Injury, receiving a thirty day Suspended Execution of Sentence and one year of probation.

9

I.        A 09-20-13 SLMPD report detailing the arrest of **Hagler** for flourishing a handgun at a victim in 2012 who was dumping trash in a dumpster in the rear alley behind 1143 Howell. The victim accused **Hagler** of pointing a semi-automatic handgun at him during the confrontation. **Hagler** admitted to having a handgun in his hand, but denied pointing the weapon at the victim. The victim refused to assist in the prosecution of **Hagler**.

INVESTIGATION UPDATES

18.        On Monday 02-23-15, **Hagler** telephonically contacted CS#2. CS#2 was able to activate an audio recording device to capture the conversation. During the course of the extensive conversation on a number of topics, **Hagler** stated:

-that he had sold a number of guns and ammunition to friends of his at great prices;

-that he is not happy with CS#1 and he better not come around his house. CS#2 stated CS#1 was afraid to come around **Hagler's** house as he did not want to step on any surprises. **Hagler** indicated he had surprises all over his yard. (From prior conversations with **Hagler**, CS#2 understands the reference to "surprises" to mean exploding booby traps.);

-that if they (law enforcement) come for his house he will have a surprise for them. In front of his house will be a flower pot with a gallon of tannerite (an explosive) on the sidewalk and a bag of marbles mixed in. CS#2 questioned **Hagler** if he thought that would take a lot of cops out. **Hagler** answered, "it should slow them down by taking a lot of their legs out.";

-**Hagler** indicated he could add a few more pages to the "Anarchist Cookbook." CS#2 asked **Hagler** like what, to which **Hagler** answered, "like the cyclone fence and cinder blocks and a fish finder on the boat." **Hagler** continued, "most of the Missouri river is twenty feet deep but there are spots that are one hundred and twenty feet, the location believed by **Hagler** to be an underwater sink hole." **Hagler** went back to the topic of the Anarchist Cookbook which **Hagler** advised contained all types of instructions on explosives and where to place them to cause the most damage.

19.        On March 3, 2015, **Hagler** spoke to CS#2 telephonically. CS#2 was not able to activate an audio recording device to capture the conversation but reported the contact to the FBI.

10

During the course of the conversation on a number of topics, Hagler stated:

-he would come by the residence of CS#2 in the next few days and modify a Glock pistol so the firearm would discharge multiple shots (three to five round bursts) with a single activation of the firearm's trigger mechanism.

20.     On March 5, 2015, Hagler met with CS#2 in person. CS#2 did activate an audio recording device to capture the conversation but the recording device failed to operate. During the course of the encounter, Hagler:

-displayed to CS#2 a Glock .40 caliber handgun which Hagler bragged he had modified to shoot more than one round with the activation of a single pull of the trigger. Hagler demonstrated the weapons capability by pulling the trigger of the weapon which caused it to fire two rounds. Hagler informed CS#2 the two round discharge was called a, "double tap." Hagler then allowed CS#2 to operate the modified Glock handgun. When CS#2 pulled the trigger of the weapon, the firearm again fired a two shot burst with a single activation of the trigger mechanism.

-during the continuing conversation, Hagler informed CS#2 he had filed off and removed the serial numbers from a handgun he (Hagler) had found on the side of the road. Hagler also stated he had sawed off the barrels of two of his shotguns and also removed the serial numbers from the weapons and then painted one of them black. Hagler also informed CS#2 he would show CS#2 how to modify weapons to make them fully automatic.

21.     On March 6, 2015, Hagler met with CS#2 in person. CS#2 did activate an audio and video recording device to capture the conversation that occurred between the pair. During the course of the encounter:

-Hagler indicated he is not happy with CS#1. Hagler mentioned to CS#2 he could easily hurt CS#1 if he really wanted to.

-Hagler told a story of his recent travel downtown and on his return trip mistakenly got onto the new bridge going to Illinois but stopped on the bridge because he had his gun sitting on the seat loaded. Hagler unloaded the firearm, broke it down into pieces and secured it within areas of his truck. Once he got back across the bridge into Missouri he re-assembled the weapon.

-Hagler indicated he buried a Glock pistol he had found on the interstate the last time he went out on the river on a hillside.

-Hagler admitted he used to grow high grade marijuana at his house then commented he still does. Hagler stated he grows it in an area hidden in the wall behind a large mirror in the basement bathroom that allows access to a hidden area of the basement but does not grow like he did because he does not have electricity.

11

-CS#2 commented he (Hagler) could get time for having his Glock pistol shoot more than one round. Hagler indicated he made his Glock pistol to shoot individual rounds again.

-Hagler described to CS#2 how he filed down a nub within the mechanism of his AR-15 to make it shoot full auto.

22.　　On March 17, 2015, Hagler met with CS#2 in person at the residences of Hagler. CS#2 did activate an audio and video recording device to capture the conversation and imagery that occurred between the pair. During the course of the encounter:

-CS#2 first met Hagler in the combined rear yards of the two specified properties. Within the curtilage of the rear yards (observed on the video recording) was:

-a white colored cab over camper, mounted on stilts, that was positioned against the rear alley side of the rear yard;

-a white painted dual wheeled box trailer with a side and rear doors, the doors being secured via a padlock;

-a green and brown camouflage pattern painted pickup truck with an open bed that had a black colored ladder rack mounted on it;

-a faded green/beige colored pickup truck bearing Missouri license 4PE930 which is registered to Hagler at 1143 Howell;

-a red/maroon Chevy Astro van bearing Missouri license 0DR360 which is registered to Hagler at 1143 Howell.

-CS#2 and Hagler then entered 1139 Howell. (It should be noted the video of the encounter inside the residence is of poor quality due to minimal illumination.) While inside the residence, CS#2 observed:

-numerous boxes of varying calibers of ammunition, scattered throughout the residence. CS#2 commented to Hagler that he had not as yet put the ammunition away.

-a bullet proof vest partially under a pillow on the bed where Hagler sleeps within the residence. Also noted was an empty gun rack for a single long gun which was mounted near the head of the bed. When CS#2 commented on the body armor and the gun rack near the head of the bed, Hagler stated he was ready.

-the gun safe of Hagler to be open. Observed by CS#2 (partially verified by the video recording) were a number of long guns to include rifles and shotguns as well as handguns. Specifically, CS#2 noted the previously described sawed off shotgun with a pistol grip within the safe.

12

23.     On March 20, 2015, Alcohol, Tobacco, and Firearms (ATF) Special Agent Michael Froncheck verified that **Hagler** has no current, or past, firearm registrations with the National Firearms Registration and Transfer Record.

## CONCLUSION

24.     I respectfully request that the Court issue a warrant for the arrest of **Hagler** based on the above information establishing probable cause that **Hagler** has violated Title 26, U.S.C. § 5861(c) and (d) (possession of an unregistered "short-barreled" shotgun and unregistered machinegun); Title 18, U.S.C. § 922(g)(3) (possession of firearms and ammunition by an unlawful user of controlled substances); Title 18, U.S.C. § 922(g)(9) (possession of firearm and ammunition by person convicted of misdemeanor crime of assault within definition of a crime of domestic violence); and Title 18, U.S.C. § 922(k) (possession of firearm with serial number removed, obliterated, or altered).